## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| Pierre G. Thorsen, | |
| Plaintiff, | |
| | Case No.: 3:20-cv-50132 |
| v. | |
| | Judge Iain D. Johnston |
| Community Unit School District 300, | |
| Defendant. | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Pierre G. Thorsen brings this Fifth Amended Complaint ("Complaint") against Community Unit School District ("the District"), alleging Title VII employment discrimination and other supplemental state law claims. The District moved for summary judgment. For the reasons below, the Court grants the District's Motion.

## Background

### 1)    Rule 56.1 Discussion

Before summarizing the material facts, the Court must first address Thorsen's total noncompliance with Local Rule 56.1.[1] Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity

---

[1] Throughout this Opinion, the Court refers to "Thorsen" (and not "Thorsen's counsel"), because that's standard practice. However, the Court doesn't expect Thorsen, a represented plaintiff, to know the ins and outs of 56.1. Instead, the Court blames Thorsen's counsel and directs its frustrations and bewilderments squarely in their direction.

with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted). "The obligations set forth by a court's local rules are not mere formalities." *Zuppardi v. Wal–Mart Stores, Inc.*, 770 F.3d 644, 648 (7th Cir. 2014). Given 56.1's importance, the Seventh Circuit has "consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) (citing *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir.1994) (collecting cases)).

Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts that it contends are undisputed and entitle it to summary judgment. L.R. 56.1(a)(2). Then, the party opposing summary judgment must file a response. L.R. 56.1(b)(2). The response must consist of numbered paragraphs that correspond to the movant's paragraphs. 56.1(e)(1). A party must admit, dispute or partially admit or dispute each of the movant's paragraphs. 56.1(e)(2). "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." 56.1(e)(3).

Especially important in this case, Local Rule 56.1 bars the nonmoving party from "set[ting]forth any new facts" in its response. 56.1(e)(2); *see also Phillipson v. McAleenan*, No. 14-CV-08138, 2019 U.S. Dist. LEXIS 169093, at *1–*6 (N.D. Ill. Sept. 30, 2019), *aff'd sub nom. Phillipson v. Wolf*, 831 F. App'x 212 (7th Cir. 2020). Nor can

2

the nonmovant assert legal arguments. 56(e)(1); *see also Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1018 (N.D. Ill. 2018) ("[C]ourt[s] disregard the portions of the parties' Local Rule 56.1 submissions that make legal arguments and assert legal conclusions, which are not factual statements at all.").

Thorsen's Local Rule 56.1(b)(2) filing is essentially impenetrable. Improper (and unsightly) formatting, lengthy irrelevant facts and inferences, and legal arguments blanket its fifty-one pages, shrouding all (if any) procedurally compliant responses. No characterization does justice; the Court lets Thorsen's Response speak for itself, exemplified by these examples:[2]

- **District Fact 6** (dkt. 195, pg. 2):[3] "In February 2019, the District received a complaint from the parents of a Jacobs High School student…"

  o **Thorsen's Response** (dkt. 226, pg. 3): ". . . The wording 'received a complaint' is purposely ambiguous. Although the District received a complaint, Plaintiff never received a copy of it, even though he had a contractual right to a copy. While D300 'received a complaint,' [the complaining family] never provided a 'written' complaint of their accusations, so D300 would

---

[2] The Court's quotations are an improvement because they reformat Thorsen's filing, which employs confusing tables and numbered lines. *See, e.g.*, dkt. 226, pgs. 10–12, 19–21, 49–51. Thorsen also arbitrarily divides the District's paragraphs into separate facts, further complicating the Court's work and likely violating LR 56.1(e) ("[The] response must consist of numbered paragraphs *corresponding to the numbered paragraphs* in [the movant's] statement.") (emphasis added).

[3] A note on numbering and citations: The District divides its facts into separate sections and restarts the numbering at each new section. Thorsen, in turn, further divides the District's paragraphs. For simplicity's sake, the Court cites the respective page on which the fact appears.

not be contractually obligated to provide any complaint
to Plaintiff, leaving him unable to prepare for the fact-
finding meeting."

- **District Fact 12** (dkt. 195, pg. 2): "Once the District gathered
information from students, [District officials] held a fact-
finding meeting with Plaintiff."

  o **Thorsen's Response** (dkt. 226, pg. 5): ". . . The
  meeting was *not* fact-finding. Facts that disputed the
  [complaining family's] claims were ignored. . . . "
  (Thorsen's complete response to District Fact 12
  reaches 600+ words).

- **District Fact 70** (dkt. 195, pg. 14): "Plaintiff was also not the
only teacher in the District to have resigned when facing
disciplinary action."

  o **Thorsen's Response** (dkt. 226, pgs. 49–51) (denying in
  part) Plaintiff, a Christian, was not truly facing
  disciplinary action. Instead, a long series of contrived
  disciplinary actions had already taken place in
  coordination with the Muslim family and the union in
  order to establish a pretextual paper trail to justify
  terminating Plaintiff, thus appeasing the Muslim
  family who were threatening to sue D300. (citation
  omitted). Plaintiff was not 'facing' true disciplinary
  action; he was forced to choose between termination or
  resignation, which is a fundamentally different position
  than the stated fact. (citation omitted). Plaintiff, a
  Christian, is the only tenured teacher to be told to enter
  a placeholder grade by his department chair four school
  days after a Muslim family's initial contact/verbal
  complaint with D300 about Plaintiff, then subsequently

4

subject to his first ever formal discipline to be placed in his personnel file, just four days after the second meeting with the Muslim family. (citations omitted). Plaintiff was the only Kane County teacher of the year nominee whose Christianity was discussed by central office secretaries with disdain and vitriol just two days after district administration met for the second time with a Muslim family who, without filing a written complaint, made allegations against Plaintiff based on a supposition inconsistent with text messages they collected. (citations omitted). Plaintiff was the only tenured Christian teacher who was subject to discipline based on unsubstantiated accusations that a Muslim family "thinks" happened, despite never obtaining any testimony from the daughter/student. (citations omitted). And subsequently had a Notice to Remedy with a multitude of infractions listed that did not violate the policies cited. Plaintiff, who is Christian, was the only tenured teacher whose union representation was informed of "all the details" three days after a Muslim family made false accusations. Plaintiff is the only tenured teacher whose union then conspired with administration to ambush Plaintiff at the fictitious grade meeting with an unannounced second topic. (citations omitted).

The Christian Plaintiff was the only teacher who was falsely accused of not following the curriculum three school days after the third time the Muslim family met with administration. (citations omitted).

At a seemingly unrelated disciplinary meeting held two days after the Muslim family's second meeting with administration, Plaintiff, a Christian, is the only tenured teacher who, with union representation at his side, sat through a disciplinary meeting about entering the placeholder grade he was instructed to enter, while the union representative had the evidence in hand. The union destroyed the evidence and refused to pursue a grievance related to the placeholder grade discipline so that the union and administration could build a paper trail that would make it appear as though the teacher was not meeting the district's legitimate expectations. (citations omitted).

Plaintiff was the only Christian teacher who sat in a meeting that began with a discussion of the potential lawsuit of the Muslim family, after which, Plaintiff was threatened with termination and forced to resign for conducting activities, known by O'Keefe to be aligned with the curriculum, policies, and initiatives created and promoted by D300. (citation omitted). This, not coincidentally, followed a month's-long series of threats of a lawsuit from the Muslim family. (citation omitted). Plaintiff's documents were not viewed by administration or union representation. (citation omitted). The matter had already been discussed with the School Board prior to the meeting. (citation omitted). Plaintiff is the only tenured teacher whose Christianity was mocked by administration two school days after his forced resignation, primarily by Falk, the social studies divisional administrator at Hampshire

high school, who stated in his deposition that the topic related to the KFC bucket prop (Kentucky Fried Christians) came up later in the curriculum. (citation omitted). For greater detail on Plaintiff being the only teacher subject to what Movant is attempting to paint as resigning when facing discipline, a chronological explanation with citations and evidence to support the above facts is included as (citation omitted).

- **District Fact 24** (Dkt. 195, pg. 15) "According to the Union, the likely repercussion of a violation of a Notice to Remedy would be termination . . . ."

  - **Thorsen's Response** (Dkt. 226, pg. 13) (denying-in-part) "Opening this point with 'according to the union' is an obvious attempt to deflect blame. . . . "

Flouting the Rules, Thorsen tosses his responsibility to efficiently identify the material facts onto the Court, inverting Local Rule 56.1's purpose and forcing the Court to hack through irrelevant and inadmissible clutter. Under these circumstances, the Court is entitled to enforce strict compliance and grant summary judgment for the District. *Bordelon*, 233 F.3d at 527.

It's also unfair to the District to permit this sort of briefing. Though the Local Rules primarily guard the Court's resources, they simultaneously ensure an efficient litigation process. The Court may choose to expend many days sifting through Thorsen's Response, but it doesn't follow that the Court can demand that the District do the same. It's a bad incentive too: bury a Rules-compliant movant in pages of 56.1(b)(2) violations, creating the illusion of disputed facts, and suffocate a

meritorious motion. Further, permitting Thorsen's Response would also allow him to end-run 56.1(d)(5): "An opposing party's LR 56.1(b)(3) statement of additional facts must not exceed 40 numbered paragraphs," without the court's permission. Thorsen's Response fills fifty pages with new facts, which would far exceed the allotted amount were they alleged in a 56.1(b)(3) statement.

The Court finds that Thorsen's 56.1(b)(2) Response deserves to be stricken in its entirety. His 56.1(b)(3) statement of additional facts doesn't fare much better, rarely providing specific record citations, as 56.1(d)(2) requires, speculating and relying on inadmissible conjecture.[4] To the extent Thorsen's additional facts aren't duplicative, they're immaterial, inadmissible, or not 56.1 compliant. Nevertheless, the Court explains separately why the District is entitled to summary judgment on the merits. In doing so, it considers (as much as possible) Thorsen's 56.1(b)(2) Response but construes any ambiguity resulting from his noncompliance against him. *See Igasaki v. Ill Dept. of Fin. & Prof. Reg.*, 988 F.3d 948, 957 (7th Cir. 2021) (finding it "well within [the district court's] discretion" to strike some of the improperly asserted facts, but consider others).

---

[4] *See, e.g.*, dkt. 226, pg. 53 ("The District had already conspired with the Union to undermine Thorsen, behind his back.") (citing three pages of Thorsen's affidavit speculating about a conspiracy); *Id.* ("Thorsen provided the student with resources that helped her, as opposed to the ineffectual resources the District provided."); *Id.* ("The District is trying to diminish Christians and Christianity from the historical record, because it removed all Christian books from the Jacobs library, diminished Christian knowledge and understanding from the curriculum following the discharge of Thorsen and eliminated the Christian Uprising Club, while allowing non-Christian religious clubs to remain.") (citing collectively Thorsen's own affidavit, another affidavit saying the school cancelled the club, and an "Exhibit 26," (likely Exhibit 25) showing a list of various cultural celebration months).

### 2) Facts

Thorsen quibbles with the way the District's characterizes nearly all of its facts, and often provides lengthy explanations for their existence or significance. But, for the most part, Thorsen doesn't dispute these determinative facts:

Parents alleged that Thorsen acted inappropriately with their daughter, encouraging her to convert to Christianity and otherwise violating appropriate student–teacher boundaries. That allegation sparked an investigation into Thorsen's conduct at school. The investigation—including a meeting with Thorsen—led the District to recommend and the School Board to adopt a resolution that imposed a suspension and certain restrictions on Thorsen's behavior. Immediately after his return, the District learned that Thorsen may have engaged in conduct that violated those restrictions and interviewed students to gather more information. The District then instructed Thorsen to participate in an investigatory meeting, at which he admitted to the underlying conduct but contended it was appropriate. Believing the District would fire him, Thorsen resigned. These are the details:

#### a.    *Relevant Non-Parties*

Colleen O'Keefe was the District's Chief Legal Officer. Dkt. 195, pg. 2; Dkt. 226, pg. 2. Kara Vicente was its Chief Academic Officer. Dkt. 195, pg. 2; Dkt. 226, pg. 2. Mike Williamson was the President of the District's teachers' union. Dkt. 195, pg. 3; Dkt. 226, pg. 7. Rob Lyons is an Illinois Education Association attorney. Dkt. 195, pg. 5; Dkt. 226, pg. 14. Lynn Adler is an attorney and a director with the Illinois

9

Education Association. In this factual background, the Court considers the "the District" and the District's "Board of Education" separate entities. So, the District's action isn't necessarily the School Board's action.

b. *District's Initial Investigation & Findings (February–April 2019)*

Thorsen taught World History at a District school from 1997 until August 2019. Dkt. 226, pg. 52, ¶ G1. At all relevant times, Thorsen observed and practiced Christianity. Dkt. 195, pg. 1; dkt. 226, pg. 1. In February 2019, a student's parents complained to the District about Thorsen's interactions with the student. Dkt. 195, pg. 2. The parents alleged that Thorsen gave their daughter a Bible, inappropriately discussed religion with her, and provided her with contact information for adults not affiliated with the District. *Id.*; dkt. 226, pg. 53 ¶ G20 (Thorsen noting his "extraordinary efforts to help a troubled student, providing her with more help than the District").

To keep things organized, this is essentially the District's standard disciplinary process: (1) Someone files a complaint against a teacher, (2) the district investigates the complaint, (3) the district organizes a "fact-finding" meeting with the accused, (4) the district drafts a "Notice to Remedy," (5) the District discusses the Notice with the accused at a "fact-finding follow-up," (6) the District proposes the Notice to Remedy at the School Board's meeting, (7) the School Board must adopt it.

In Thorsen's case, the District investigated the parents' allegations. Dkt. 195, pg. 2. It then organized a "fact-finding" meeting. *Id.* pg. 3. Fact-finding meetings

10

help determine what occurred and gives an employee the chance to respond to concerns. *Id.* As required, the District informed Thorsen that the meeting could lead to discipline and that he could bring a union representative. *Id.*; dkt. 226, pg. 7. In that three-hour meeting, Thorsen admitted that he provided a student with resources outside the District, and sometime discussed religion with inquiring students. *Id.*, dkt. 226, pgs. 9–10. Thorsen believes that the District didn't give him enough time to present his case and that the Union didn't properly represent him. *See* dkt. 226, pgs. 5–6.

### c. *District's Notice to Remedy*

The District determined that Thorsen violated the District's policies, and prepared a "Notice to Remedy."[5] Dkt. 195, pgs. 3–4. A Notice to Remedy is a state-required official, written statement that lists issues a tenured teacher must correct to continue employment. *Id.* at 4.

The Notice explained that "[b]ased on the investigation," the District concluded that: (1) Thorsen initiated a student Bible Study class without the knowledge or approval of the District. *See* dkt. 195, Ex. 4, pg. 1; (2) Provided a student with a Bible; *Id.* (3) Repeatedly discussed religion, particularly Christianity, with students and in a way that was not part of the school's curriculum; (4) Engaged in conversations with a student about the student's religious conversion, and made positive comments

---

[5] In his 56.1(b)(2) Response, Thorsen (in 1500+ words) challenges each of the District's factual findings in its Notice to Remedy. But the material fact is whether the District (rightly or wrongly) determined that Thorsen violated the District's policies. This isn't the time or place to challenge the District's substantive findings.

about her interest in Christianity; (5) Discussed one student's personal matters with other students; (6) Without informing the parents or directing the student to trained staff, "[p]rovided the student with the names and contact information of several adults that have no affiliation with the school or District," which Thorsen said he did to "provide [the student] with a support network and to prepare for the possibility that the student may be disowned by her parents." Dkt. 195, Ex. 4, pg. 1.

The District determined that Thorsen "exhibited an unacceptable lack of understanding as to the appropriate parameters of the teacher/student relationship." *Id.* Consequently, it recommended that the Board impose a seven-day unpaid suspension, transfer schools, and adopt remedial directives for Thorsen to follow after his return. Relevant in this case included three specific directives:

> (8) Do not discuss religion with students unless it is in the context of an academic subject that the prescribed curriculum dictates. More specifically, do not give preferential treatment to any single religion or religious belief. This includes discussing your faith and/or the faith of others before, during or after school. This also includes answering questions about your faith and Christianity before, during or after school.
>
> (14) Refrain from referencing a student's cultural, religious, or racial background or discussing the same any time during the performance of the your duties. This includes instructional time and all interactions with colleagues and students in your professional capacity as teacher. The only exception to this directive would be if the

> information is relevant to the health, safety, or welfare
> concern.
>
> (15) Refrain from making comments or discussing topics
> that would imply an inappropriate level of familiarity with
> a student.

*Id.* The Notice also stated that "[f]ailiure to comply with these directives will result in further disciplinary action, up to and including your dismissal as a tenured employee in this School District." *Id.*

On April 16, 2019, the District held a fact-finding follow-up meeting to discuss the Notice with Thorsen. Dkt. 195, pg. 4; dkt. 226, pg. 13. Union President Williamson, and Illinois Education Association attorney Rob Lyons were present. Dkt. 195, pgs. 4–5; dkt. 226, pgs. 13–14. The Union frequently involved attorneys in the Notice proceedings. Dkt. 195, pg. 5; dkt. 226, pg. 14. O'Keefe, Vicente, and Willamson all testified that each part of the Notice was explained to Thorsen and that clarifying questions were asked. Dkt. 195, Ex. 2, 119:16–121:24; Ex. 3, 96:1–18; Ex. 6, 73:24–74:17. [6]

On April 23, 2019, the District's Board of Education adopted the resolution authorizing the Notice to Remedy. Dkt. 195, pgs. 5–6; Dkt. 226, pg. 15. Thorsen admits that the above Notice provisions "applied to [Thorsen's] professional conduct

---

[6] In response, Thorsen points to his own affidavit saying the Union representatives didn't speak during the meeting. As the Court explains below, the extent to which the Union representatives participated in the meetings is immaterial to deciding the Title VII question.

and interactions with students, generally, for the balance of his employment." Dkt. 195, pgs. 5–6; Dkt. 226, pg. 16.

### d.   Thorsen's August 2019 Conduct

Pursuant to the Notice, the District transferred Thorsen to another school. Dkt. 195, pgs. 5–6; Dkt. 226, pg. 17.  He was assigned two classes, World History and U.S. History, as well as an academic support period.  The academic support period functioned like a study hall, where a teacher supervised and answered general questions, but wasn't expected to conform to any curriculum.[7]

On the first day of school, in both his classes and the academic support period, Thorsen conducted a "get-to-know-you ice-breaker."  Dkt. 195, pg. 6; Dkt. 226, pg. 18. Thorsen asked students about the "historical background" of their last names.  Dkt. 196, Ex. 1, 40:13–20.  If a student didn't understand what Thorsen meant by that question (which many didn't), he would ask "what's the background of your last name, can you tell me the origin of that name?"  *Id.* 40:22–41:2.  If students were still confused, Thorsen would use his name as an example and tie it to his Scandinavian and Norwegian background.  *Id.* 41:20–42:12.  If students didn't know the origins, Thorsen encouraged them to discuss their "family background and heritage of th[eir] name" with their parents and let him know.  *Id.* 42:3–42: 21.  Thorsen was the only

---

[7] Thorsen splits hairs over a teacher's role in the study period.  The District says it's not "instructional time," and that there's no curriculum but that students can ask for help with their classes.  According to Thorsen, he can only assist if he's also instructing.  That's all beside the point, because Thorsen admits that the Notice applied to all of his interactions and conduct.

teacher known to have conducted such an ice-breaker. [8] *Id.* Ex. 11; 36:4–19; Ex. 3., 24:14–25:20.

The District received a complaint about or otherwise became aware of Thorsen's ice-breaker.[9] *See Id.* Ex. 3, 23:4–12; Ex. 12, ¶¶ 4–6. In response, the District investigated the accusation. Dkt. 195, pg. 7; dkt. 226; pg. 23. It interviewed approximately ten students in Thorsen's class. Dkt. 195, pg. 7; dkt. 226; pg. 23. The students "consistent[ly]" reported that Thorsen's ice-breaker asked them to provide information about "their background[,] heritage, [and] ethnicity." Dkt. 195, Ex. 3., 24. The students also reported that once they shared information about their cultural background, Thorsen would comment on how that background might affect them today. *See* Dkt. 195, Ex. 2, 50:20–51:6 ("[I]f they were half German and half Italian, he would say something to the effect of . . you're at war with yourself . . . because this part of you is fighting this part of you.").[10]

The interviewed students also reported that Thorsen had empty Kentucky Fried Chicken ("KFC") buckets in his classroom on the first days of schools. Dkt. 195,

---

[8] Thorsen writes a 550+ word essay responding to this fact, offering a winding, irrelevant tangent about his understanding of the ice-breaker and other school policies. As the Rules require, the Court ignores all of that. He also doesn't identify another teacher who was known to lead such an ice-breaker.

[9] In 700+ words, Thorsen contends that there's no documented evidence of a "complaint" related to the ice-breaker. The District couldn't produce one, instead largely admitting that they're not 100% sure how it came to their attention—a Board member's child, another teacher, or through the grapevine. But Thorsen admits he ran the ice-breaker, so it's baffling why he spills so much ink on this immaterial point.

[10] Thorsen doesn't dispute this information, indeed he admits "the students may have reported the ice-breaker." Instead, his lengthy response "denying in-part" only argues that his ice-breaker was consistent with the curriculum. The Court, therefore, accepts that students made these reports.

pg. 8; dkt. 226; pg. 24.  When a student asked about the buckets, Thorsen explained that they symbolized how Christians were persecuted and burned alive in ancient Rome, becoming "Kentucky Fried Christians."[11] Dkt. 195, pg. 8; dkt. 226; pgs. 24–26.

### e.   *August 2019 Notice of Fact-Finding and Thorsen's Departure*

On or around August 20, 2019, O'Keefe sent a Notice of Fact-Finding, directing Thorsen to report to a meeting on August 23, 2019.  Dkt. 195, pg. 8; dkt. 226; pg. 26. The Notice of Fact-Finding advised Thorsen that the meeting's purpose was to investigate whether his actions on the first few days of school violated the April 2019 Notice to Remedy, specifically directives (8) (discussing religion outside of prescribed curriculum); (14) (referencing a student's cultural, religious, or racial background); and (15) (making comments or discussing topics that would imply an inappropriate level of familiarity with a student).  Dkt. 195, pg. 8; dkt. 226; pgs. 26–27.

The facts show that at the time the District notified Thorsen about the meeting, the District intended to gather more information and determine what happened in the classroom; the District hadn't yet decided about Thorsen's employment.[12]  Dkt. 195, Ex. 2, 96:1–97:14, 113:4–18 (O'Keefe testifying that she participated in fifty meetings and never went into them with predetermined

---

[11] Again, Thorsen admits all of this as a factual matter, but argues that his actions were within the curriculum.

[12] Thorsen denies this (i.e. argues that the District had already made a decision), but points to no *facts* in the record to refute it.  Instead, he argues that, because he didn't share documents or sufficiently present his case at the meeting, the District must have already made a determination before they scheduled the meeting.  But that's an *inference*, not a fact. So, for summary judgment purposes, the District's version is undisputed.

conclusions); Ex. 3, 87:22–89:6 (Vicente testifying that the meeting's purpose was to give Thorsen an opportunity to respond to the allegations); Ex. 6, 29:13–30:15 (Williamson testifying that fact-finding meeting are meant to determine whether the accusations are truthful). The District hadn't communicated with the Board about Thorsen's alleged violations before the meeting.[13] Ex. B, 34:14–16.

Thorsen, O'Keefe, Vicente, and Williamson attended the August 23, 2019 meeting. Dkt. 195, pg. 9; dkt. 226; pg. 29. Lynn Adler, an attorney and a director with the Illinois Education Association, also attended. *Id.* The purpose of Union representation at the fact-finding meeting was to advise Thorsen and ensure compliance with the collective bargaining agreement.[14] Dkt. 195, pg. 10.

At the meeting, Thorsen admitted that he conducted the ice-breakers and that he discussed his KFC prop during an academic support period. Dkt. 195, pgs. 9–10; dkt. 226; pgs. 31–32. He also admitted that he hadn't used the KFC props since approximately 2006. *Id.* Thorsen said both the ice-breaker and the prop complied with the District's polices. Dkt. 226; pgs. 31–32. O'Keefe then said, "in her view,"

---

[13] Thorsen denies this fact, essentially arguing that contact occurred between the District and the parent of an interviewed student in Thorsen's class who was also a Board *member*. The record supports that response, but the Court understands the District to be saying that there was no formal communication (i.e. a letter/advisement) sent to the Board of Education before the fact-finding meeting. Regardless, it seems immaterial whether a Board member (or the Board) knew about the fact-finding meeting.

[14] The Court accepts this as a fact, because Thorsen doesn't meaningfully dispute it. He cites Williamson's testimony that the Union didn't *recommend* one action over another, instead explaining the expected ramifications of each approach (which is what "advise" means). *See* Dkt. 226, pg. 30 (citing dkt. 195, Ex. 6, 36:2, 17, 18). Thorsen also argues, without any proof, that the Union "worked against" him, citing with no pinpoint his 1500+ word, conjecture-filled response to another fact.

Thorsen violated the Notice to Remedy,[15] but that she was not the person who could suspend or terminate him. Dkt. 195, Ex. 2, 56:18–57:20. To terminate or suspend a tenured teacher like Thorsen, the Board would need to adopt such a resolution. Dkt. 195, pg. 10.

The Court can't make sense of Thorsen's responses to what happened next at the meeting. But in sum (and drawing reasonable inferences in Thorsen's favor despite 56.1 violations), O'Keefe implied that the Board would likely accept her findings and ultimately fire him. *See* dkt. 195, pg. 10. Without District officials present, Williamson and Adler discussed Thorsen's options and largely agreed with O'Keefe's predictions. *See* dkt. 195, pg. 10. Williamson and Adler suggested Thorsen's best move was to resign. *See* dkt. 195, pg. 10. Williamson and Adler communicated Thorsen's willingness to resign to O'Keefe. *See* dkt. 195, pg. 10. O'Keefe returned with a letter of resignation, and Thorsen, feeling pressured, signed it. *See* dkt. 195, pg. 10. Thorsen admits that O'Keefe didn't speak directly to him about resigning. *See* dkt. 226, pg. 40. Thorsen speculates that, outside his presence, O'Keefe told Williamson and Adler that Thorsen had to resign immediately.[16]

---

[15] The Court also accepts this as a fact, because Thorsen's "denial" isn't appropriate. He writes "[r]efusing to view Plaintiff's documents, and not taking them with for the Board to view disproves O'Keefe['s] assertion that 'in her view' he had violated the Notice to Remedy because her 'view' did not include all the facts." That nonsensical argument belongs nowhere near a 56.1(b)(2) response.

[16] Thorsen denies that O'Keefe and Vicente did not tell Williamson that Thorsen needed to resign before leaving the meeting. Dkt. 226, pg. 38. Citing his own affidavit, Thorsen infers that such a condition was imposed because Williamson came back into the room and (according to Thorsen) said "the *deal* is, you have to make that choice before you leave the room." (emphasis added). Dkt. 226, pg. 38. Thorsen reasons that since "it takes two sides to make a deal, the time limit probably came from O'Keefe and/or Vicente." Dkt. 226, pg. 38. The Court can't take that sort of 56.1 response seriously either.

Thorsen also speculates, without evidence, that O'Keefe had prepared a letter of resignation before the meeting and that Williamson and Adler "colluded" with the District.

**Summary Judgment Analysis**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable jury could return a verdict for the nonmovant, construing the evidence and all reasonable inferences in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986); *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). However, the Court need not draw every conceivable inference, only reasonable ones. *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 905 (7th Cir. 2005). And "[s]peculation is insufficient to withstand summary judgment." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1127 (7th Cir. 1996). Indeed, "the nonmoving party 'must do more than simply show there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Under Local Rule 56.1, the Court limits its analysis to the facts presented in the Parties' 56.1 statements. *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015).

a)     **Title VII Claim**

First, the Court understands Thorsen to ground his Title VII claim on his August 2019 departure. That's the natural reading of his Complaint and the only issue he substantively addresses in his 56.1(b)(2) Memorandum. Importantly, then, Thorsen doesn't claim that the April 2019 Notice to Remedy and Thorsen's suspension constituted a Title VII adverse employment action or discrimination.[17]

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In discrimination cases, "[w]hen a defendant moves for summary judgment, the 'singular question' for the district court is whether the plaintiff has introduced evidence that would 'permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Igasaki v. Ill. Dept. of Fin. & Prof. Reg.*, 988 F. 3d 948, 957 (7th Cir. 2021).

One way of defeating an employer's summary judgment motion is to meet the burden shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Id.* "The familiar McDonnell Douglas approach requires a plaintiff to make a prima facie case of discrimination, at which point the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does

---

[17] Thorsen alleges in his Fifth Amended Complaint that "Defendant otherwise created a hostile environment, intolerable conditions, and undue restrictions against Christianity," citing the Notice to Remedy. But his 56.1 briefings don't argue that the April 2019 events constitute discrimination or an adverse action. On the contrary, his briefings focus exclusively on the August departure.

20

so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Id.* (citing *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d at 598, 602 (7th Cir. 2020)). To make a prima facie case under McDonell Douglas, a plaintiff must show: (1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from his employer. *Marshall v. Indiana Dep't of Correction*, 973 F.3d 789, 791–92 (7th Cir. 2020). But a plaintiff need not use the McDonell Douglas framework after *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). *Igasaki*, 988 F.3d at 957. At summary judgment, "[w]hat matters is whether [a plaintiff] presented enough evidence to allow the jury to find in [his] favor." *Vega v. Chicago Park Dist.*, 954 F.3d 996, 1004 (7th Cir. 2020). Under either framework, Thorsen fails to make the required showing.

### 1) *Adverse Employment Action*

As a threshold matter, Thorsen must first establish that the District took an adverse employment action against him. If, on the other hand, Thorsen voluntarily resigned, the District wouldn't face Title VII liability. In this case, Thorsen contends that his August 2019 departure constituted an adverse employment action.

As this Court carefully explained in its Order on the District's Motion to Dismiss, dkt. 46, an employer's conduct can constitute an adverse action even if a plaintiff technically resigned. *See* dkt. 46, pgs. 10–18 (discussing other scenarios that qualify as an adverse action, specifically "threat-plus misrepresentation," "can't-take-

21

it-anymore," and "*fait accompli*" theories). In that decision, the Court noted Thorsen's "sparse" allegations, and stressed that "[w]hen a plaintiff has difficulty framing a claim, that is likely a bad sign as to the merits of the action." *Id.*, at pg. 16. The Court conceded, however, that "[its] suspicions of the merits of the claims does not result in dismissal." *Id.*, at pg. 17.

As the Court predicted, discovery didn't help Thorsen's speculative claim. Even considering the additional "facts" inappropriately thrown in Thorsen's 56.1(b)(2) response, a reasonable fact-finder can't conclude that Thorsen didn't resign on his own. Thorsen's claim rests largely on his unsupported theory that the Union and the District colluded "behind his back." In reality, as his Union representatives explained, it was in Thorsen's best interest to resign as it avoided a "termination" on his record. Thorsen admits that O'Keefe lacked the authority to fire him *sua sponte* (hampering his threat-plus and *fait accompli* theories), although he argues with little admissible support that the Board rubber-stamped the District's decisions. Without any discussion, he also concludes that the August 2019 meeting's circumstances (where he was allegedly yelled at without counsel and only given a resignation offer) qualifies as a termination under the "can't take it anymore standard." These are largely the same "scarce" facts that barely survived a motion to dismiss; they're insufficient to meet the summary judgment standard.

b)    *Religious Discrimination*

Assuming, *arguendo*, that the District effectively fired Thorsen, he still can't defeat the summary judgment motion. His claim turns on a simple, largely

uncontested question: In April 2019, did the District validly adopt a Notice to Remedy restricting Thorsen's conduct? Thorsen doesn't meaningfully allege that the District singled him out to impose strict conditions. To the contrary, credible allegations about Thorsen's conduct were brought to the District's attention, prompting an investigation. After conducting many interviews and meeting with Thorsen, the District found that Thorsen behaved inappropriately, failing to respect proper student–teacher boundaries. The District then proposed and the School Board adopted the April 2019 Notice.

An important note: Thorsen never alleges that the District didn't afford him due process or that the restrictions were unconstitutional.[18] He disagrees with the District's substantive findings and believes he acted properly with the student, but that's all irrelevant. Without Thorsen identifying something legally wrong with the District's Notice, it's not the Court's job to second-guess whether it reached the correct decision in initially imposing the restrictions.

With the Notice restrictions in place, a reasonable fact-finder can't conclude that Thorsen "met his employer's legitimate expectations." The Notice clearly barred Thorsen from discussing a student's "cultural, religious, or racial" background or speaking about religion outside the assigned curriculum. Yet, on the first days of school, Thorsen led an irregular ice-breaker that, at a minimum, prodded discussion

---

[18] Thorsen mentions many times that his Union representatives didn't participate as much as he thought they should have. Similarly, he believes the District didn't adequately consider his arguments at the April 2019 meeting. True or not, neither renders the Notice legally inadequate.

about restricted topics. Additionally, Thorsen brought multiple KFC buckets (unquestionably likely to provoke inquiry) to highlight ancient Christians' willingness to engage in martyrdom.

Thorsen devotes much of his 56.1(b)(2) Response to arguing why his actions technically fell within the curriculum, and therefore didn't violate the Notice. The Court doesn't need to decide whether that's true, though it notes Thorsen seems to stretch the language. The District had just suspended Thorsen and imposed clear conditions on his return. It could legitimately expect that, on his first days back, he wouldn't come near the line. And, in any event, firing him for borderline transgressive conduct doesn't then establish that the discharge was religiously discriminatory. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 691 (7th Cir. 2008) (citing *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005) ("[I]t is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie.")); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006) ("Federal courts have authority to correct an adverse employment action only where the employer's decision is unlawful, and not merely where the adverse action is unwise or even unfair.").

Finally, Thorsen doesn't identify any similarly-situated employee who the District treated more favorably. He alleges without support that the District allowed other employees to discuss their personal views, and that others led similar ice-breakers. Again, he provides no admissible proof to support that speculation. But

24

even if he's right, he doesn't allege that those employees were subject to a Notice to Remedy that imposed specific restrictions, so they're not similarly situated. So, Thorsen doesn't rebut the presumption that the District acted without a religiously discriminatory purpose.

Thorsen doesn't fare better under the *Ortiz* framework. Under that standard, the "determinative question" is whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's religion caused the discharge or other adverse employment action. *Ortiz*, 834 F. 3d at 765. In Thorsen's case, the admissible evidence demonstrates that the District imposed restrictions on Thorsen's conduct because parents credibly accused him of acting inappropriately and not respecting proper boundaries.[19] When the District believed that Thorsen violated those restrictions, they prepared to impose further consequences. But at all times, the evidence shows it was Thorsen's Notice violations—not his religion—that triggered disciplinary action.

### c)      Remaining Counts

Because the Court grants the District's Motion on the Title VII claim, it declines to exercise supplemental jurisdiction over the fraud and conspiracy claims. *See RWJ Mgmt. Co. v. BP Prods. N. Am.*, 672 F.3d 476, 479-80 (7th Cir. 2012). These claims are dismissed for lack of jurisdiction.

---

[19] The restrictions undoubtedly touched on religious conduct, but the evidence shows that religious discussions were the means by which Thorsen allegedly crossed student–teacher boundaries, so it's unsurprising that the Notice restricted such conduct. Again, Thorsen doesn't allege that the Notice restrictions violated any other law.

**Conclusion**

For the above reasons, the Court grants the District's Motion [192]. It dismisses the remaining state law claims for lack of jurisdiction.

Date:  December 19, 2024                    By:  _____

                                                 Iain D. Johnston

                                                 United States District Judge